Filippo Marchino, Esq. (SBN 256011)
FM@XLAWX.com
Damon Rogers, Esq. (SBN 263853)
DR@XLAWX.com
Thomas E. Gray, Esq. (SBN 299898)
TG@XLAWX.com
**THE X-LAW GROUP, P.C.**
625 Fair Oaks Ave, Suite 390
South Pasadena, CA 91030
Tel: (213) 599-3380
Fax: (213) 599-3370

Attorneys for Plaintiffs Frankie Lomas
and Roxanda Yancor, Individually
and on Behalf of All Others
Similarly Situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKIE LOMAS and ROXANDA YANCOR, Individually and on Behalf of All Others Similarly Situated <br><br> Plaintiffs, <br><br> v. <br><br> DELTA AIR LINES, INC. a Delaware Corporation <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      Plaintiffs Frankie Lomas ("Lomas") and Roxanda Yancor ("Yancor") (collectively "Plaintiffs") bring this suit against Delta Air Lines, Inc. ("Delta" or "Defendant") to recover damages owed to them and others similarly situated.

2.      This lawsuit arises out of the decision of a Delta pilot to release approximately 15,000 gallons of jet fuel over a densely populated area when a Delta airplane needed to return to the airport shortly after takeoff.  While the pilot could have avoided altogether doing so or, in the alternative, could have done so safely in any number of ways, the pilot instead opted to undertake a course of action that saturated numerous properties along the flight path with petroleum derived products, including jet fuel.  As a result of Delta's employees' conduct, Plaintiffs and other similarly situated property owners, tenants, and occupants have incurred damages from expenses that will be incurred in cleaning up the mess that Delta made, including removing the jet fuel from the affected surfaces, replacing those items that the fuel cannot be removed from, and repairing those items susceptible to damage by jet fuel.

**PARTIES**

3.      Plaintiff Frankie Lomas is, together with his wife Roxanda Yancor, the owner of a house in Los Angeles County, California.  He is a citizen of the State of California.

4.      Plaintiff Roxanda Yancor is, together with her husband Frankie Lomas, the owner of a house in Los Angeles County, California.  She is a citizen of the State of California.

5.      Defendant Delta Air Lines, Inc. is a Delaware Corporation with its principal place of business in Georgia.

**CLASS ACTION COMPLAINT**

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332 because there are over 100 members of the proposed class, at least one member of the proposed class has a different citizenship from a defendant, and the total matter in controversy exceeds $5,000,000.

7.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because Defendant is subject to the Court's personal jurisdiction in this judicial district.

**FACTUAL ALLEGATIONS**

**I.      Delta Douses Jet Fuel on the Homes of Los Angeles County Residents.**

8.      On the morning of January 14, 2020, Shanghai-bound Delta Flight 89 took off from Los Angeles International Airport ("LAX").  Shortly after takeoff, the Boeing 777-200 jet experienced a compressor stall in one engine, requiring it to return to LAX.  The 777-200 is designed and certified to be able to fly safely with only one functional engine, so this development did not pose any immediate danger to the passengers of Flight 89.  However, upon experiencing this problem, the pilot had to decide what to do. The pilot elected to return to LAX and land.

9.      At this point, the pilot faced another decision. The plane had enough fuel onboard to last the duration of the flight to China. This fuel brought the weight of the aircraft to a higher level than optimal for landing. In order to deal with the excess fuel the plane was carrying, the pilot had the ability to decide whether to seek a longer runway (which the pilot did request and obtain) in order to execute a higher speed approach and landing (to account for the extra weight of the fuel) or, in the alternative, reduce the weight by eliminating fuel.

10.      Under the standard operating procedures for such circumstances, pilots

3

**CLASS ACTION COMPLAINT**

1    may dispose of the excess fuel by burning it while flying in circles or by outright

2    dumping it to reduce the weight of the plane before it lands.  In the event of a fuel

3    dump, the plane is supposed to engage in this procedure by either: (i) dumping the

4    fuel at a higher altitude (at least 5000 feet above ground level ("AGL")) to allow for

5    the atomization and vaporizing of the fuel in the atmosphere, thereby preventing the

6    fuel from reaching the ground; (ii) dumping the fuel over non-populated areas; or

7    (iii) a combination of (i) and (ii), meaning, higher altitude and over non-populated

8    areas.

9         11.   Additionally, under any circumstance, a fuel dump requires the

10   notification of air traffic control ("ATC") in order to allow ATC to redirect air traffic

11   to other areas so that other aircraft avoid flying through a cloud of atomized jet fuel.

12   This is for the safety of the other air traffic as well as the safety of people on the

13   ground.

14        12.   Notwithstanding the above, the pilot of Flight 89 decided to instead

15   initiate a fuel dump at a lower altitude, and without notification of ATC, even though

16   there was absolutely no need to do so.

17        13.   The Delta aircraft proceeded to drop fuel from approximately 5,000 feet

18   AGL to 2,000 feet AGL, dousing numerous properties as it flew overhead.  The

19   airplane traveled approximately 15 miles while it released fuel onto at least 12,000

20   properties below it.  Ultimately, Flight 89 dumped a total of 15,000 gallons of fuel

21   before returning to LAX just minutes after takeoff.  Among the locations that the

22   airplane sprayed with jet fuel were a number of schools and thousands of properties.

23   More than 60 people, including at least 20 children, were treated from seven schools

24   in the area, and thousands of properties remain, to this day, covered in jet fuel.

25        14.   The decision to dump the fuel at a low altitude over a highly populated

26   area is highly unusual, and uncalled for.  Normally, the pilot would have instead

27   dumped the fuel over the ocean or non-populated land, or otherwise landed with the

28   fuel still in the aircraft.

4

**CLASS ACTION COMPLAINT**

15. In fact, while aircraft can dump fuel in order to reduce weight prior to landing, unless the emergency is time critical, the practice is not a matter of safety, but of profit. Although an overweight plane can safely land, in doing so it theoretically risks damaging certain parts, resulting in the airline making costly repairs and having to take the aircraft out of service. In fact, the airline is required to inspect the plane following an overweight landing, thereby removing the plane from service for some time, even if it is ultimately determined that nothing was damaged.

16. Nevertheless, Boeing has stated that "service experience indicates that damage due to overweight landing is extremely rare." On information and belief, the reason why the pilot opted to dump the fuel rather than land the plane while overweight was because the pilot was following Delta's policies, which prioritize minimizing the costs that would be incurred as a result of an overweight plane landing over the well-being of those that the dumped fuel may land on.

17. The FAA stated that the Delta flight crew did not tell ATC that they needed to dump fuel. Typically, the crew would inform ATC of the issue so that it could direct the plane to a less populated area.

18. When the pilot alerted ATC to the problem and informed them that the plane would need to return to LAX, the pilot did not warn ATC of his intention to dump fuel. Instead, he stated the opposite, which was consistent with a higher weight approach and landing:

Pilot: "We've got it back under control. We're going to come back to LAX. We're not critical. We're going to slow to 280 knots, and uh, why don't you point us downwind at 8,000 feet (unintelligible) and we'll turn back to LA."
Tower: "OK, so you don't need to hold or dump fuel or anything like that?"
Pilot: "Uh, negative."

19. In a statement made shortly after the incident, the FAA explained that

5

**CLASS ACTION COMPLAINT**

1   "The FAA is thoroughly investigating the circumstances behind today's incident

2   involving a Delta Air Lines flight that was returning to Los Angeles International

3   Airport.  There are special fuel-dumping procedures for aircraft operating into and

4   out of any major US airport.  These procedures call for fuel to be dumped over

5   designated unpopulated areas, typically at higher altitudes so the fuel atomizes and

6   disperses before it reaches the ground."

7           20.   If the fuel had been jettisoned at a higher altitude, it would have

8   completely vaporized before reaching the ground.  Boeing, relying on United States

9   Air Force studies, has recommended that fuel be jettisoned above 5,000-6,000 feet

10  to accomplish this.  In addition, the jet could have dumped the fuel over the Pacific

11  Ocean, thereby avoiding releasing it over a populated area.

12          21.   Following the incident, Delta stated in a press release that it had

13  dispatched 13 cleaning crews to work with LAUSD crews to clean all outside

14  surface areas with the schools that had been doused with jet fuel.  However, it has

15  done nothing to remedy the situation for property owners, occupants, and tenants

16  whose homes and other properties were coated with jet fuel as well.

17          22.   On or about January 17, 2020, the South Coast Air Quality Management

18  District issued a Notice of Violation to Delta, alleging that it caused a public

19  nuisance in dumping the jet fuel.

20

21  **II.     Property Owners And Residents Incur Substantial Damages.**

22          23.   As a result of the Delta pilot's decision to dump 15,000 gallons of fuel

23  at a low altitude and over a highly populated area, thousands of properties have

24  become coated in jet fuel.  The jet fuel has caused harm to the property owners and

25  residents for a number of reasons.

26          24.   First, the jet fuel caused the properties to smell with a noxious odor that

27  persisted for days after the fuel was released.  Second, the fuel caused damage to

28  driveways, land, outdoor belongings, and roofs.  For example, in the case of

**CLASS ACTION COMPLAINT**

properties with asphalt shingle roofs, because aircraft fuels are refined crude oils and are chemically compatible with the asphalt, a spray of the fuels will cause a softening of the asphalt binder that in turn causes a deterioration of the shingles and a reduction of impermeability (waterproofness).  Polycarbonate (plastic) member roofs suffer similar damage as well.  Third, the fuel can be embedded in metals, wood, fabrics and other exterior materials that come into contact with the fuel. While a substantial portion of the fuel components does evaporate, depending of the type of jet fuel and its chemical composition, several elements are left behind, meaning that many of the items covered by the jet fuel will need to be properly cleaned and/or replaced. Fourth, many property owners, occupants, and tenants have outdoor plants and gardens: any organic living structure, as a plant, that came into contact with the jet fuel, will likely yield contaminated fruit and pollen, thereby requiring them to dispose of otherwise healthy plants and flowers. Fifth, the land and the properties themselves need to be properly cleaned in order to prevent the further contamination of land, waterways, and the general environment.

25.  Finally, possessions of property owners, tenants, and occupants that were outside when the fuel was dumped will have to be cleaned or replaced.  Vehicles will have to be thoroughly cleaned.  Items made out of fabric, such as lounge chair cushions, have become soiled and will need to be replaced.

26.  Property owners cannot simply wash the jet fuel away; at most, it will simply be washed into the soil of their properties, where it will linger.  In addition, jet fuel seeps into porous surfaces, where it becomes difficult to remove. Accordingly, professional remediation is required to remove the jet fuel from the properties where it landed, and such remediation costs hundreds or thousands of dollars per property.

//

**CLASS ACTION COMPLAINT**

### III.  The Class Representatives.

Plaintiffs Frankie Lomas and Roxanda Yancor are the owners and residents of a house in Los Angeles County, California that was doused by jet fuel from Delta's jet.  Like other property owners, occupants, and tenants whose properties were sprayed with jet fuel, Plaintiffs have incurred damages, including, but not limited to, the cost required to restore their property and residence to the state it was prior to being sprayed by jet fuel.  Like other class members, their home now has a lingering noxious odor that has persisted days after the jet fuel was dumped on their home.  Plaintiffs have also been unable to eat any of the produce that they grew themselves because it was contaminated by the jet fuel.  The home's asphalt shingles have been damaged as well, and their external belongings have to be appropriately cleaned and repaired or replaced.

## CLASS ACTION ALLEGATIONS

27.   Plaintiffs brings this action on their own behalf, and as a class action on behalf of the Class defined herein, pursuant to, and properly maintainable under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3).  The Class is also maintainable under Fed. R. Civ. P. 23(c)(4) on the issue of liability.  The Class consists of hundreds of property owners whose properties were doused by jet fuel released by Delta Flight 89.  Specifically, Plaintiffs bring this suit on behalf of the following Class:

> The "**PROPERTY DAMAGE CLASS**":  All persons who own, rent, or reside in real property on which jet fuel released by Delta Air Lines, Inc. Flight 89 on January 14, 2020 landed.  The class excludes counsel representing the class and all persons employed by said counsel, governmental entities, Delta Air Lines, Inc., its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

**CLASS ACTION COMPLAINT**

28.   Plaintiffs shall serve as class representatives of the Property Damage Class.

29.   Defendants subjected Plaintiffs and the Class to the same wrongdoing and harmed them in the same manner. Now, Plaintiffs and the Class seek to enforce the same rights and remedies pursuant to the same legal theories: negligence, private nuisance, and trespass.

30.   <u>Numerosity</u>: The proposed class and subclass are so numerous that individual joinder of all their members is impracticable. While the exact number and identities of the Class Members are unknown at this time, such information can be ascertained through appropriate investigation and discovery. It is estimated that the "Property Damage Class" consists of thousands of members. The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

31.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class in that their claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory as their claims.

32.   <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have further retained the undersigned counsel, who have substantial experience in prosecuting complex lawsuits and class action litigation. Plaintiffs and undersigned counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

33.   <u>Superiority of Class Action and Impracticability of Individual Actions</u>: Plaintiffs and the members of the Class suffered harm as a result of Defendant's unlawful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of all members of

9

**CLASS ACTION COMPLAINT**

1  the Class is impractical. Even if individual Class Members had the resources to

2  pursue individual litigation, it would be unduly burdensome to the courts in which

3  the individual litigation would proceed. Individual litigation magnifies the delay and

4  expense to all parties in the court system of resolving the controversies engendered

5  by the Defendant's common course of conduct. The class action device allows a

6  single court to provide the benefits of unitary adjudication, judicial economy, and

7  the fair and equitable handling of all Class Members' claims in a single forum. The

8  conduct of this action as a class action conserves the resources of the parties and of

9  the judicial system and protects the rights of the Class Members. Adjudication of

10  individual Class Members' claims with respect to Defendant would, as a practical

11  matter, be dispositive of the interests of other members not parties to the

12  adjudication and could substantially impair or impede the ability of other Class

13  Members to protect their interests.

14  34. <u>Common Questions of Law and Fact Predominate</u>: In addition, the

15  requirements of Federal Rule of Civil Procedure 23 are satisfied by questions of law

16  and fact common to the claims of Plaintiffs and of each member of the Property

17  Damage Class and which predominate over any question of law or fact affecting

18  only individual members of the Property Damage Class. Common questions of law

19  and fact include, but are not limited to, the following:

20  1. Did Delta dump jet fuel on January 14, 2020?

21  2. Did jet fuel dumped by Delta on January 14, 2020 reach the ground?

22  3. Does having one's property coated with jet fuel interfere with the free

23  use or enjoyment of one's property?

24  4. Did Plaintiffs and the Class give Delta permission to dump jet fuel on

25  their properties?

26  5. Is Delta negligent?

27  6. Did Delta commit private nuisance?

28  7. Did Delta commit trespass?

10

**CLASS ACTION COMPLAINT**

1        8.   Are Plaintiffs and the Class entitled to compensatory damages?

2        9.   Are Plaintiffs and the Class entitled to nominal damages?

3       10. Are Plaintiffs and the Class entitled to punitive damages?

4       11. Are Plaintiffs and the Class entitled to an award of attorneys' fees?

5    35.   <u>Notice</u>: Notice can be provided via internet publication, published notice

6  and/or through mail and paid for by the Defendant.

## FIRST CLAIM FOR RELIEF

## NEGLIGENCE

36.   The allegations of paragraphs 1 through 35 are re-alleged and incorporated herein by reference, and Plaintiffs allege as follows a cause of action on behalf of themselves and the class of similarly situated Property Damage Class members.

37.   Delta has a duty to exercise reasonable care in operating its aircraft.

38.   Delta breached its duty when Flight 89 dumped jet fuel at a low altitude over populated areas in such a manner that the property of Plaintiffs and the Class under the plane became coated in fuel.

39.   As a result of Delta's conduct, Plaintiffs and the Class have suffered damages.

40.   Delta acted with a conscious disregard of the rights of others and put its own financial interests ahead of the interests of Plaintiffs and the Class, which constitutes malice.

41.   Delta engaged in despicable conduct that subjected Plaintiffs and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

42.   Therefore, Delta acted with oppression and/or malice and Plaintiffs and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

**CLASS ACTION COMPLAINT**

**SECOND CLAIM FOR RELIEF**

**PRIVATE NUISANCE**

43. The allegations of paragraphs 1 through 42 are re-alleged and incorporated herein by reference, and Plaintiffs allege as follows a cause of action on behalf of themselves and the class of similarly situated Property Damage Class members.

44. Plaintiffs and the Class are owners, occupants, and/or tenants of real property.

45. In releasing jet fuel onto the real properties Plaintiffs and the Class owned, occupied, and/or resided in, Delta created a condition that is an obstruction to the free use of the properties, so as to interfere with the comfortable enjoyment of the properties.

46. The jet fuel has interfered with the use or enjoyment of the properties by Plaintiffs and the Class.

47. Plaintiffs and the Class did not consent to Delta's conduct.

48. The seriousness of the harm outweighs the public benefit of Delta's conduct.

49. An ordinary person would be reasonably annoyed or disturbed by Delta's conduct.

50. As a result of Delta's conduct, Plaintiffs and the Class have suffered damages.

51. Delta acted with a conscious disregard of the rights of others and put its own financial interests ahead of the interests of Plaintiffs and the Class, which constitutes malice.

52. Delta engaged in despicable conduct that subjected Plaintiffs and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

53. Therefore, Delta acted with oppression and/or malice and Plaintiffs and

12

**CLASS ACTION COMPLAINT**

the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## THIRD CLAIM FOR RELIEF

### TRESPASS

54.    The allegations of paragraphs 1 through 53 are re-alleged and incorporated herein by reference, and Plaintiffs allege as follows a cause of action on behalf of themselves and the class of similarly situated Property Damage Class members.

55.    Plaintiffs and the Class are owners, occupants, and/or tenants of real property.

56.    Delta caused jet fuel to be released over the real properties of Plaintiffs and the Class, which in turn caused the jet fuel to land on the properties of Plaintiffs and the Class.

57.    Plaintiffs and the Class did not give Delta permission to cause jet fuel to enter their properties.

58.     As a result of Delta's conduct, Plaintiffs and the Class have suffered damages.

59.    Delta acted with a conscious disregard of the rights of others and put its own financial interests ahead of the interests of Plaintiffs and the Class, which constitutes malice.

60.    Delta engaged in despicable conduct that subjected Plaintiffs and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

61.    Therefore, Delta acted with oppression and/or malice and Plaintiffs and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

**CLASS ACTION COMPLAINT**

1

## PRAYER FOR RELIEF

2   WHEREFORE, Plaintiffs pray for judgment against Defendant as follows on

3   behalf of themselves and the Class:

4   Plaintiffs seeks to recover the following damages and obtain the following

5   relief from Defendant:

6   (a)   Compensatory damages suffered by Plaintiffs and the Class;

7   (b)   Nominal damages;

8   (c)   Punitive damages;

9   (d)   All reasonable and necessary attorneys' fees;

10  (e)   Court costs;

11  (f)   Pre and post-judgment interest;

12  (g)   And such other relief to which Plaintiffs and the Class may show

13  themselves justly entitled.

14

15  DATED: January 24, 2020          **THE X-LAW GROUP, P.C.**

16

17  By:_____

18  FILIPPO MARCHINO, ESQ.,
    Attorneys for Plaintiff

19

20                           **JURY DEMAND**

21

22  Plaintiffs hereby demand a trial by jury on all issues so triable.

23

24  DATED: January 24, 2020          **THE X-LAW GROUP, P.C.**

25

26  By:_____

27  FILIPPO MARCHINO, ESQ.,
    Attorneys for Plaintiffs

28

14

**CLASS ACTION COMPLAINT**