1   Filippo Marchino, Esq. (SBN 256011)
    FM@XLAWX.com
2   Carlos X. Colorado, Esq. (SBN 231031)
    CC@XLAWX.com
3   Thomas E. Gray, Esq. (SBN 299898)
    TG@XLAWX.com
4   **THE X-LAW GROUP, P.C.**
    625 Fair Oaks Ave, Suite 390
5   South Pasadena, CA 91030
    Tel: (213) 599-3380
6   Fax: (213) 599-3370

7   Class Counsel and Attorneys for
    Plaintiffs Frankie Lomas, Roxanda Yancor,
8   Jose Alvarado, and Maria Alvarado
    Individually and on Behalf of All Others
9   Similarly Situated

10                  **UNITED STATES DISTRICT COURT**

11                  **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13   In Re: Delta Air Lines, Inc. | Lead Case No. LA CV20-00786 JAK (SKx) |
| 14 | Consolidated Case No. LA CV20-00786 JAK (SKx) |
| 15 | |
| 16 | |
| 17   FRANKIE LOMAS, ROXANDA YANCOR, JOSE ALVARADO, and MARIA ALVARADO, Individually and on Behalf of All Others Similarly Situated | **CLASS PLAINTIFFS' NOTICE OF MOTION AND UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS UNDER RULE 23(h)** |
| 18 | |
| 19 | |
| 20          Plaintiffs, | |
| 21             v. | Judge:  John A. Kronstadt |
| 22   DELTA AIR LINES, INC. a Delaware Corporation | Date: September 15, 2025 |
| 23 | Time: 8:30 a.m. |
| 24          Defendant. | Place: Courtroom 10C |

25

26

27

28

---

**CLASS PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS UNDER RULE 23(h)**

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on Monday, September 15, 2025 at 8:30 a.m., or as soon thereafter as this matter may be heard, in the above-entitled Court located at 255 E. Temple Street, Courtroom 540 of the Roybal Federal Building and United States Courthouse, 5th Floor, Los Angeles, California 90012, Plaintiffs Frankie Lomas, Roxanda Yancor, Jose Alvarado, and Maria Alvarado will and hereby do move this Court for preliminary approval of attorneys' fees, expenses, and service awards under Rule 23(h).

Counsel for Plaintiffs and counsel for Delta met and conferred with respect to this Motion pursuant to Local Rule 7-3 and established that Delta would not oppose it.

This unopposed motion is based on this Notice of Motion, the accompanying declarations of Filippo Marchino, Carlos Colorado, Richard Davis, Thomas Gray, Frankie Lomas, Roxanda Yancor, Jose Alvarado, and Maria Alvarado, and the Expert Report of Professor Charles Silver.

DATED: August 25, 2025          THE X-LAW GROUP, P.C.

By:_____
FILIPPO MARCHINO, ESQ.,
Class Liaison Counsel and Attorneys
for Class Plaintiffs

**Table of Contents**

I.    **Introduction**……..………………………………………………………..1

II.   **Background**……...…………………………………………………………..1

III.  **Argument**  …………………………………………………………………..1

a. Class counsel's requested fee is fair and reasonable. …………………………1

     1. An independent mediator and law professor with expertise in class action attorneys' fees support the fee request. ……………………………3

     2. The settlement provides substantial monetary and non-monetary compensation to class members. ………………………………………………4

     3. Pursuing this litigation was very risky…………………………………7

     4. This litigation has been exceptionally complex on legal, technical and engineering levels. ……………………………………………………………9

     5. Class counsel carried considerable financial burden in litigating this complex and time-consuming action. ………………………………………..18

     6. The fees requested are comparable to those awarded in other class actions. ……………………………………………………………………19

     7. A lodestar cross-check confirms the requested fees are reasonable….19

          i. Class counsel expended a reasonable number of hours litigating this case. ………………………………………...20

          ii. Class counsel's rates are reasonable……………………21

          iii. Class counsel's performance and the results achieved justify a reasonable lodestar multiplier……………………22

b. Class counsel's expenses are reasonable and appropriate. …………………..23

c. The class representatives have earned the requested service awards through years of dedication to this case. ……………………………………………..24

IV.   **Conclusion** ……………………………………………………………….26

---

**CLASS PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS UNDER RULE 23(H)**

1

### Table of Authorities

2

**CASES**

3

Andrews v. Plains All Am. Pipeline L.P., No. CV154113PSGJEMX, 2022 WL
   4453864 (C.D. Cal. Sept. 20, 2022).................................................................................passim

4

Andrews v. Plains All Am. Pipeline, L.P., No. CV154113PSGJEMX, 2018 WL
   2717833 (C.D. Cal. Apr. 17, 2018)........................................................................................ 8

5

Bebchick v. Wash. Metro. Area Transit Comm'n, 805 F.2d 396 (D.C. Cir. 1986).....................7

6

Boeing Co. v. Van Gemert, 444 U.S. 472 (1980)........................................................................... 2

7

Brown v. CVS Pharmacy, Inc., No. 15-cv-7631, 2017 WL 3494297  (C.D. Cal. Apr.
   24, 2017) ................................................................................................................................ 23

8

Dickey v. Advanced Micro Devices, Inc., No. 15-CV-04922-HSG, 2020 WL 870928
   (N.D. Cal. Feb. 21, 2020)...................................................................................................... 23

9

Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326 (N.D. Cal. 2014)........................................... 22

10

Farrell v. Bank of Am. Corp., N.A., 827 F. App'x 628 (9th Cir. 2020)...................................... 19

11

Fischel v. Equitable Life Assur. Soc'y of U.S., 307 F.3d 997 (9th Cir. 2002) ........................... 21

12

Fisher v. Ciba Specialty Chemicals Corp., 238 F.R.D. 273 (S.D. Ala. 2006).............................. 8

13

Garner v. State Farm Mut. Auto. Ins. Co., No. CV 08 1365 CW EMC, 2010 WL
   1687832 (N.D. Cal. Apr. 22, 2010) ...................................................................................... 25

14

Gutierrez v. Amplify Energy Corp., No. 821 CV 01628 DOC JDEX 2023 WL
   3071198 (C.D. Cal. Apr. 24, 2023)....................................................................................... 24

15

Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998)............................................................7

16

Harris v. Marhoefer, 24 F.3d 16, (9th Cir. 1994).......................................................................23

17

Hefler v. Wells Fargo & Co., No. 16-CV-05479-JST, 2018 WL 6619983 (N.D. Cal.
   Dec. 18, 2018)........................................................................................................................ 20

18

Hensley v. Eckerhart, 461 U.S. 424 (1983) ................................................................................... 4

19

In re Am. Apparel, Inc. S'holder Litig..., No. CV 10–06352 MMM (JCGX), 2014 WL
   10212865  (C.D. Cal. July 28, 2014)..................................................................................... 16

20

In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935 (9th Cir. 2011) ................. 2, 4, 19, 22

21

In re Capacitors Antitrust Litig., 2018 WL 4790575 (N.D. Cal. Sept. 21, 2018)....................... 20

22

In re Korean Air Lines Co., Ltd. Antitrust Litig., 2013 WL 7985367 (C.D. Cal. Dec.
   23, 2013) .................................................................................................................................. 2

23

In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig., No.
   4:14-MD-2541-CW, 2017 WL 6040065  (N.D. Cal. Dec. 6, 2017)...................................... 25

24

In re Nexus 6P Prods. Liab. Litig., No. 17-CV-02185-BLF, 2019 WL 6622842 (N.D.
   Cal. Nov. 12, 2019).................................................................................................................. 4

25

In re Omnivision Techs., Inc., 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................... 3, 4, 9

26

27

28

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 2672
CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017).................................... 18

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994)........................ 18

*In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508 (N.D. Cal.
2020) ............................................................................................................................ 21, 25

*Ingram v. Oroudjian*, 647 F.3d 925  (9th Cir. 2011)........................................................ 21

*Isabel v. Velsicol Chem. Corp.*, No. 04-2297 DV, 2006 WL 1745053  (W.D. Tenn.
June 20, 2006)............................................................................................................. 8

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975).......................................... 22

*Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367  (N.D. Cal.
Feb. 2, 2009) .......................................................................................................... 2, 19

*Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480 (2016) ......................................................... 2

*Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346 (N.D. Fla. 2017) ..................................................... 8

*Lloyd v. Navy Fed. Credit Union*, No. 17-CV-1280-BAS-RBB, 2019 WL 2269958
(S.D. Cal. May 28, 2019) ......................................................................................... 23

*Lopez v. Youngblood*, No. CV-F-07-0474 DLB, 2011 WL 10483569 (E.D. Cal. Sept.
2, 2011) .......................................................................................................................... 7

*Martin v. Toyota Motor Credit Corp.*, No. 220CV10518JVSMRW, 2022 WL
17038908 (C.D. Cal. Nov. 15, 2022)...................................................................... 23

*Miller v. Ghirardelli Chocolate Co.*, No. 12-CV-04936-LB, 2015 WL 758094 (N.D.
Cal. Feb. 20, 2015)................................................................................................... 23

*Navarro v. ExxonMobil Corp.*, No. CV 17-2477 DSF (SKX), 2022 WL 22248790
(C.D. Cal. July 5, 2022) ............................................................................................. 8

*Ochinero v. Ladera Lending, Inc.*, No. SACV 19-1136 JVS (ADSx), 2021 WL
4460334 (C.D. Cal. July 19, 2021) ......................................................................... 22

*O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359 (C.D. Cal. 1997)........................................... 8

*Pan v. Qualcomm Inc.*, No. 16-CV-01885-JLS-DHB, 2017 WL 3252212 (S.D. Cal.
July 31, 2017).............................................................................................................. 5

*Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2022 WL 17722395 (N.D.
Cal. Dec. 15, 2022) ................................................................................................... 21

*Retta v. Millennium Prods., Inc.*, No. CV15-1801 PSG AJWX, 2017 WL 5479637
(C.D. Cal. Aug. 22, 2017).......................................................................................... 23

*Rieckborn v. Velti PLC*, No. 13-3889, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015) .................. 19

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) .............................................. 24, 25

*Romero v. Producers Dairy Foods, Inc.*, No. 1:05CV0484 DLB, 2007 WL 3492841
(E.D. Cal. Nov. 14, 2007)........................................................................................... 2

*Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244 (C.D. Cal. 2016) ................................... 19, 23

*Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734 (9th Cir. 2016) ........................................... 21

Staton v. Boeing Co., 327 F.3d 938 (9th Cir. 2003) ......................................................... 1, 23, 25

Stetson v. Grissom, 821 F.3d 1157  (9th Cir. 2016) ..................................................................... 22

Tait v. BSH Home Appliances Corp., 2015 WL 4537463 (C.D. Cal. July 27, 2015) ................... 2

United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403 (9th Cir. 1990) ................... 21

Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294 (N.D. Cal. 1995) .............................. 22, 25

Vizcaino v. Microsoft Corp., 290 F.3d 1043 (9th Cir. 2002) ............................................... passim

Waldrup v. Countrywide Fin. Corp., No. 2:13-CV-08833-CAS-AGRx, 2020 WL 13356468 (C.D. Cal. July 16, 2020) ....................................................................................... 21

Willner v. Manpower Inc., No. 11-cv-2846, 2015 WL 3863625 (N.D. Cal. June 22, 2015) ................................................................................................................................... 24

**OTHER AUTHORITIES**

Attorney Fees and Expenses in Class Action Settlements: 1993–2008, 7 J. Empirical Legal Stud. 248 (2010) ........................................................................................................ 24

Attorneys' Fees in Class Actions 2009-2013, 92 N.Y.U. L. Rev. 937 (2017) ..................... 22, 24

**RULES**

Federal Rule of Civil Procedure 30(b)(6) .................................................................................. 14

Federal Rule of Civil Procedure 23 .............................................................................................. 8

Federal Rule of Civil Procedure 23(h) ............................................................................. 5, 1, 4, 23

**TREATISES**

5 Newberg and Rubenstein on Class Actions § 15:62, 15.65 (6th ed.) ......................................... 2

Federal Judicial Center, Manual for Complex Litigation § 21.71 (4th ed.) .................................. 4

Steiner v. Am. Broad. Co., 248 F. App'x 780 (9th Cir. 2007) ................................................... 23

## I. INTRODUCTION

Class Plaintiffs Frankie Lomas, Roxanda Yancor, Jose Alvarado, and Maria Alvarado (collectively "Class Plaintiffs") respectfully move for the Court's preliminary approval of an award of $24,000,000 in attorneys' fees and $1,974,409.57 in reasonable expenses to Class Counsel, and an award of $15,000 to each of the Class Plaintiffs as service award for their contributions in this case.

## II. BACKGROUND

Class Plaintiffs have detailed the extensive history of this litigation in the concurrently filed Joint Motion for Preliminary Approval (Dkt No. 694). For efficiency, Plaintiffs will not repeat that history here, but rather incorporate it by reference. In sum, this litigation was fiercely contested over a five-year period between January 2020 and the fall of 2024, involved countless complex and highly technical factual disputes (ranging from the effects of sulfidation related corrosion of high pressure turbine blades within a jet engine to the interactions between the fluid dynamics of a 777-232ER flying at low altitude and fuel being jettisoned from the wing tips), as well as cutting-edge legal arguments (ranging from the applicability and preemption of Federal Aviation Authority rules to the effects of the alleged contamination on the disclosure requirements of home sellers in California), and only settled on the very eve of trial.

## III. ARGUMENT

### A. **Class Counsel's Requested Fee is Fair and Reasonable.**

Attorneys' fee awards in class action cases are governed by Federal Rule of Civil Procedure 23(h), which provides that, after a class has been certified, the Court may award reasonable attorneys' fees and costs. The Court's role is to "'carefully assess' the reasonableness of the fee award." Brown v. CVS Pharmacy, Inc., 2017 WL 3494297, at *5 (C.D. Cal. Apr. 24, 2017) (quoting Staton v. Boeing Co., 327 F.3d 938, 963 (9th Cir. 2003)).

"[L]awyer[s] who recover[] a common fund . . . [are] entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478

(1980). This "common benefit doctrine" allows a court to "assess[] attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit."

Where litigation leads to the creation of a common fund, courts can determine the reasonableness of a request for attorneys' fees using either the common fund method or the lodestar method. In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 944–45 (9th Cir. 2011). However, "[t]he use of the percentage-of-the-fund method in common-fund cases is the prevailing practice in the Ninth Circuit for awarding attorneys' fees and permits the Court to focus on showing that a fund conferring benefits on a class was created through the efforts of plaintiffs' counsel." In re Korean Air Lines Co., Ltd. Antitrust Litig., 2013 WL 7985367, at *1 (C.D. Cal. Dec. 23, 2013). The percentage-of-the-fund method confers "significant benefits…including consistency with contingency fee calculations in the private market, aligning the lawyers' interests with achieving the highest award for the class members, and reducing the burden on the courts that a complex lodestar calculation requires." Tait v. BSH Home Appliances Corp., 2015 WL 4537463, at *11 (C.D. Cal. July 27, 2015); 5 Newberg and Rubenstein on Class Actions § 15:62, 15.65 (6th ed.).[1]

Courts use a 25% benchmark rate as "a starting point for analysis" but the Court must "take into account all of the circumstances of the case." Vizcaino, 290 F.3d at 1048. However, "fee awards in class actions average around one-third of the recovery." Knight v. Red Door Salons, Inc., No. 08-01520 SC, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009) (quoting Romero v. Producers Dairy Foods, Inc., No. 1:05CV0484 DLB, 2007 WL 3492841, at *4 (E.D. Cal. Nov. 14, 2007)); See also Silver Report at 17. As

---

[1] The common fund approach is also endorsed by California law, a relevant consideration in this particular case given that the claims here are brought under this state's law. See Laffitte v. Robert Half Int'l Inc., 1 Cal. 5th 480, 503 (2016) (endorsing percentage of the fund approach and affirming an award equal to one-third of the common fund); see also Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002).

Professor Silver explains, the market rate for contingent fee litigation is greater than 25% of recovery as well.  Silver Report at 17-19

"When assessing the reasonableness of a fee award, courts consider '(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases.'" Andrews v. Plains All Am. Pipeline L.P., No. CV154113PSGJEMX, 2022 WL 4453864, at *2 (C.D. Cal. Sept. 20, 2022) (quoting In re Omnivision Techs., Inc., 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008)).

1. **An Independent Mediator and Law Professor with Expertise in Class Action Attorneys' Fees Support the Fee Request.**

The $24 million in fees requested here were a component of the mediator's proposal made by the Hon. Louis M. Meisinger (Ret.), which was accepted by the parties.  [Declaration of Filippo Marchino, "Marchino Decl." ¶ 10.]  Implicit in the mediator's proposal was a recognition by Judge Meisinger that a $24 million fee award is appropriate here.  It is also important to note that, at the time of Judge Meisinger's mediator's proposal, he had been involved with the matter for almost four years, and had conducted no fewer than four in-person mediation sessions, requested that the parties partake in hybrid opening/closing presentations to the other sides, and, perhaps more importantly, had been regularly briefed as to all of the work that was being done in the case.[2]

In addition, Professor Charles Silver of the University of Texas at Austin has submitted a report finding that the $24 million fee request is reasonable.  [Silver Report. at 2.]  The principal focus of Professor Silver's academic career has been class action litigation and attorneys' fees; he has written extensively about the subjects and has testified about them as an expert many times.  [Id. at 2-5.]  Among other things, he notes

---

[2] Judge Meisinger listened to several of the hearings in the case, including the hearings on the Motion for Class Certification, on Delta's Motion for Summary Judgment, and the like.

3

1  that the fact that the requested fee is a product of a mediator's proposal alleviates

2  common fears about excessive fees because Class Counsel had no control of its size.

3  [Id. at 11-12.]

4                      2.   **The Settlement Provides Substantial Monetary and Non-**

5                           **Monetary Compensation to Class Members.**

6         As the Court is aware, the settlement in this case encompasses two equally

7  important recoveries for the class: one is a monetary common fund in the amount of

8  $78,750,000; the other is a hyper-technical and hyper-realistic simulation of the fuel

9  jettison effects that, when applied on a class-wide basis, resolves to a large extent the

10 claim for stigma-related diminution in value that Class Plaintiffs alleged.

11        Of course, the monetary recovery Class Counsel secured for the Class is the

12 central factor to evaluate the reasonableness of a requested fee. In re Bluetooth, 654

13 F.3d at 942; In re Omnivision Techs., Inc., 559 F. Supp. 2d at 1046; see also In re Nexus

14 6P Prods. Liab. Litig., No. 17-CV-02185-BLF, 2019 WL 6622842, at *12 (N.D. Cal.

15 Nov. 12, 2019) ("The most critical factor is the results achieved for the class."); Hensley

16 v. Eckerhart, 461 U.S. 424, 436 (1983) (same); Federal Judicial Center, Manual for

17 Complex Litigation § 21.71 (4th ed.) ("The 'fundamental focus is the result actually

18 achieved for class members.'") (citing Fed. R. Civ. P. 23(h) committee note).

19        That principle strongly supports the requested fees here.  The Settlement Fund

20 consists of a monetary recovery of $78,750,000.  Settlement Agreement § II(II).  After

21 deduction for attorneys' fees, litigation costs, service awards, and settlement

22 administration, the Net Settlement Fund is approximately $50,590,000.   As was

23 explained in the motion for preliminary approval, at a 100% claim submission rate, a

24 typical family of four that both owns and resides in a property within the class area,

25 would receive a total recovery of $1,326.60.  At a 50% claim submission rate, the same

26 family would receive a total of $2,612.36.

27        Additionally, Courts also routinely consider non-monetary benefits obtained

28 through a class settlement in evaluating the reasonableness of the requested fee.

                                                4

Vizcaino, 290 F.3d at 1049 (identifying "[i]ncidental or non-monetary benefits conferred by the litigation are a relevant circumstance"); Pan v. Qualcomm Inc., No. 16-CV-01885-JLS-DHB, 2017 WL 3252212, at *12 (S.D. Cal. July 31, 2017) (concluding that "substantial" non-monetary relief that could not be accurately valued supported fee award of nearly 30%).

Here, the monetary recovery is complemented by the simulation and testing that was performed pursuant to the agreement of Class Plaintiffs and Delta, which helps significantly mitigate, if not entirely resolve, the harm property owners would face when they disclose to prospective home buyers the fact that their properties were hit by jettisoned fuel. As a result of the testing and simulation protocol that was developed through the extensive work of four separate experts[3], the results of testing conducted by an independent laboratory ultimately established that there is now no detectable level

---

[3] Four experts were involved in drafting, reviewing, and approving the testing and simulation protocol: **Dr. Timothy P. Jung** (an Aeronautical Engineer and Director of Aviation at Engineering Systems Inc., a licensed professional engineer in Colorado, with experience in flight testing, aerodynamics, aircraft design, and experimental methods at the Air Force Academy and Air Force Test Pilot School); **Mr. Nathan Cobb** (Aerospace Engineer, principal engineer of Protean, LLC, and an expert in the design, testing, optimization, and analysis of aircraft and aircraft systems); **Dr. James Wells** (a Professional Geologist with experience in hydrogeology and geochemistry, licensed by the California Board for Engineers, Land Surveyors and Geologists, and President of LEA Environmental, Inc., an environmental hydrogeology and remediation company); and **Mr. Robert Ettinger** (a Chemical Engineer and Senior Principal with Geosyntec Consultants, Inc., with extensive expertise in the assessment of soil and groundwater due to chemical releases). To reach the point of familiarity with the subject matter at issue here, and to render a proper protocol for this simulation and testing that would accurately reflect the incident of Delta 89, these experts expended, throughout the duration of the present case, collectively over 1,000 hours of professional work, at an enormous cost to the Parties. As a result of the experts' extensive knowledge of the case and their involvement in designing and approving the testing protocol, Class Plaintiffs were able to rely on and accept the experts' declarations as a basis for agreeing to the settlement terms. Stated differently, the collective expertise that contributed to the testing protocol gave the Class Plaintiffs confidence in the test results and thus conferred a significant benefit on the Class.

5

of contamination from the Delta 89 jettison. These findings will significantly reduce, or even completely eliminate, the diminution of value that these properties may have otherwise suffered as a result of the Delta 89 jettison.  For comparison, if each property owner were to hire an independent expert to test the property for contamination from the fuel jettisoned by Delta 89, the Parties estimate the cost to test each property would be at least $5,000 per property[4], or a total of $190,675,000.[5]

Significantly, the non-monetary component of the settlement is of greater value to Class Plaintiffs than is the monetary component. For the property owners in the Class, the testing protocol and resulting certification that there is no detectable contamination remaining on the properties is a crucial element of the settlement because it allows the owners to avoid the stigma and the related loss of value they would have experienced had they needed to disclose to potential buyers the fact of the fuel contamination without then providing the assurances given by the certification. In fact, for each Class Representative homeowner, this component of the settlement was more important than the cash they will be entitled to as a member of the Class.

Similarly, for those class members that are not owners but rather residents of the properties and are living in the area, the testing protocol and related certification of non-detectability delivers a peace of mind that they, and their families, are not being exposed to jet fuel toxins. Likewise, this allows all residents to return to a full use of the properties they reside in, use which had previously been curtailed following the exposure to jet fuel. Each Class Plaintiff stated that this reassurance was worth more to

_____

[4] See Dkt 297-12 at 18.

[5] Such individual testing likely would result in findings that the tested soil location was contaminant free, leaving homeowners (and prospective buyers) to wonder whether the testing of other locations on the same property might render different results. In other words, testing the soil under the lemon tree in the front yard would not guarantee that the soil in the back yard was equally risk free. But the testing protocol engineered by the parties accounts for those potential differences and results in an assurance that an individual property owner likely could not get through individual testing, and which would cost significantly more.

6

1  them than the money they will be paid as a Class member. Thus, the non-monetary

2  aspect of the settlement brings even more value to the Class than did a relatively

3  significant cash payment. A sense of safety is undoubtedly very valuable.

4        Professor Silver also believes that these nonmonetary benefits support the

5  reasonableness of the fee request.  [Silver Report at 14.]

6        In addition, courts may "consider the public benefits of counsel's efforts in

7  determining the level of reasonable compensation." Bebchick v. Wash. Metro. Area

8  Transit Comm'n, 805 F.2d 396, 408 (D.C. Cir. 1986).  While this litigation brings both

9  monetary and non-monetary relief to the Class of approximately 38,000 properties, it

10 also delivers important relief to all California residents by holding a multi-billion dollar

11 corporation accountable for its actions, thereby sharply increasing the cost of causing

12 environmental harm in California and putting similar corporations on notice.

13              3. **Pursuing This Litigation Was Very Risky**

14       An upward departure from the benchmark is warranted where litigation is risky,

15 complex, or there is an absence of precedent.  See Vizcaino, 290 F.3d at 1048 ("absence

16 of supporting precedents" made litigation risky and results obtained exceptional);

17 Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998) (identifying "the

18 complexity and novelty of the issues presented" as justifying departure from the

19 benchmark); Lopez v. Youngblood, No. CV-F-07-0474 DLB, 2011 WL 10483569, at

20 *6 (E.D. Cal. Sept. 2, 2011) (upward departure warranted due to risk because "[t]he

21 authority upon which Plaintiffs were able to rely was relatively scant.").

22       This litigation has always been risky.  Although Plaintiffs were able to obtain

23 class certification, their ability to do so largely hinged on the development of a very

24 complex fuel jettison map that could be used to establish where the jettisoned fuel

25 landed.  That map was the result of extensive work, which included the 3D scanning

26 and measurement of the subject aircraft, as well as the implementation of highly

27 complex fluid dynamics and 3D weather models.  Compared to other types of class

28 actions, such as securities, antitrust, employment, or general consumer actions, trespass

1   and property contamination class actions have a poor track record of being successfully

2   certified because satisfying the predominance requirement of Rule 23 is often difficult

3   to satisfy. <u>See</u>, <u>e.g.</u>, <u>O'Connor v. Boeing N. Am., Inc.</u>, 180 F.R.D. 359, 382 (C.D. Cal.

4   1997); <u>Lee-Bolton v. Koppers Inc.</u>, 319 F.R.D. 346, 385 (N.D. Fla. 2017); <u>Fisher v.</u>

5   <u>Ciba Specialty Chemicals Corp.</u>, 238 F.R.D. 273, 307 (S.D. Ala. 2006); <u>Isabel v.</u>

6   <u>Velsicol Chem. Corp.</u>, No. 04-2297 DV, 2006 WL 1745053, at *11 (W.D. Tenn. June

7   20, 2006).  This is highlighted by the fact that Class Plaintiffs, in their class certification

8   motion, were only able to identify *two* successful contamination trespass class

9   certification motions in California.   [Dkt. No. 297 at 18-19.]   One of these was

10  decertified just after the hearing on class certification in this action.   <u>Navarro v.</u>

11  <u>ExxonMobil Corp.</u>, No. CV 17-2477 DSF (SKX), 2022 WL 22248790, at *22-24 (C.D.

12  Cal. July 5, 2022) (decertifying due to concerns over predominance).   The other,

13  <u>Andrews</u>, was only certified on the *third* try.  <u>Andrews v. Plains All Am. Pipeline, L.P.</u>,

14  No. CV154113PSGJEMX, 2018 WL 2717833 (C.D. Cal. Apr. 17, 2018).   In approving

15  fees when <u>Andrews</u> settled, the court explained that the risk of litigation was "only

16  magnified by the novelty" of the case.  <u>Id.</u> at *3.

17          Beyond the inherent risk of pursuing the trespass class action, there was always

18  a significant risk in terms of devising a viable methodology to articulate damages.  The

19  results of the independent testing performed at the direction of Class Plaintiffs' and

20  Delta's counsel highlight one of the primary risks that Class Plaintiffs always faced with

21  respect to their damages claims.  Years after the jettison, the properties that were hit by

22  jettisoned fuel are, on a chemical testing level, indistinguishable from those that were

23  not. Thus, Plaintiffs' property owner damages theories always rested on largely

24  untested, yet sound, legal arguments: that property owners would be entitled to have the

25  top few inches of soil removed and replaced to get rid of a portion of the jet fuel

26  contaminants in order to achieve acceptable levels of detectability; otherwise, property

27  owners would have a duty to disclose the fact that jettisoned fuel landed on the

28  properties and, even though the amount that remained might be undetectable, that

1   disclosure would nonetheless result in a significant loss in property value associated
2   with the stigma of the fuel on the property.

3       In addition, as if those challenges were not enough, Plaintiffs' likelihood of
4   prevailing in this action hinged on their ability to get around Delta's preemption
5   arguments, where, again, Plaintiffs were faced with novel issues, including how a
6   federal standard of care could be synthesized with California trespass law, and whether
7   pilots' emergency authority might preclude liability.  (See, e.g., Dkt. No. 59, 61, 249.)

8       Moreover, it is well established that "the risk that further litigation might result
9   in no recovery is a 'significant factor.'"  Andrews, 2022 WL 4453864, at *3 (quoting
10  In re Omnivision Techs., Inc., 559 F. Supp. 2d at 1047).

11      Here, there was always a significant risk that although jurors might agree with
12  Plaintiffs and their experts, they also might side with Delta and either reject the notion
13  that class members should be given money to remove an undetectable amount of jet fuel
14  residue, or otherwise find persuasive Delta's argument that, in practice, homes in the
15  class area do not sell for less than those outside of it, hence negating the stigma damages
16  proffered by Class Plaintiffs. There was also a remote risk that, although Plaintiffs'
17  claims survived Delta's standard of care motions, Delta might win on appeal.

18          4. **This Litigation Has Been Exceptionally Complex on Legal,**
19          **Technical and Engineering Levels.**

20      As this Court knows, this class action has been unusually complex, and Class
21  Plaintiffs have only been able to prevail thus far due to the skill and creativity of Class
22  Counsel.  In addition to the significant issues inherent in certifying a contamination
23  trespass class, as well as the difficulty of overcoming Delta's preemption arguments, as
24  was explained above, there also has been significant motion practice and discovery over
25  the past five years. Collectively, Class Plaintiffs and Delta have served a total of 1,472[6]
26  discovery requests, exchanged more than 418,000 unique pages of documents, and

27  _____

28  [6] This number represents all requests for production, interrogatories, requests for
    admission, and requests in subpoenas.

9

conducted a total of 52 depositions of 49 witnesses, including experts.  [Marchino Decl.
¶ 5.]  For Class Plaintiffs, the vast majority of this discovery has been technical. The
Court is aware of the efforts that went into developing the fuel jettison map that was the
lynchpin of class certification, which required significant understanding of complex
engineering principles. The Court also is aware of the efforts necessary to prove liability
and survive Delta's federal standard of care motion for summary judgment, which also
required significant mastery of aviation issues. Beyond these, there was a litany of other
matters that had to be addressed which required specialized technical knowledge.
[Marchino Decl. ¶6.]  This included the following areas:

(1) the **Boeing 777-200** generally (which included, but was not limited to,
the subjects of overall aircraft design, flight deck layout, one engine operation
certification (also known as ETOPS), the aircraft weight and balance, overweight
landing performance, emergency landing considerations, landing distance
calculations, "normal" and "non-normal" braking performance, thrust reverser
operation, asymmetric thrust effects and considerations, Thrust Asymmetry
Compensation (also known as "TAC") system operation and limitations, rejected
takeoff certification testing, one-engine climb performance, autobrake settings and
operation, auto throttle settings and operation, engine indication system operation
and signaling, landing distance performance calculation, Minimum Equipment List
(also known as "MEL") limitations, engine fire protection system design and
operation, aircraft maintenance records, and wheel fuse plug design and operation);

(2) the **Fuel Jettison System** aboard the Boeing 777-200 (which included,
but was not limited to, the subjects of the overall system design and operation,
jettison nozzle dimensional inspection, jettison system flow rate scheduling based
on aircraft state, fuel system pump performance and limitations, fuel jettison
regulations and historical precedent, Delta fuel dumping considerations, incident
jettison system maintenance record review, and flight testing and certification of
the 777 jettison system);

10

(3) the **inspection** of the Incident Aircraft (which included the laser scanning and 3D modeling of the incident aircraft, physical inspection and measurement of fuel jettison nozzles of the incident aircraft, inspection of the cockpit of the incident aircraft, and the inspection of the cockpit flight manuals of the incident aircraft);

(4) the **Digital Flight Data Recorder** (the "DFDR") aboard the Boeing 777-200 (which included, but was not limited to, the subjects of the DFDR system design, parameters, and operating limitations, the DFDR data recovery processes and tools, DFDR data handling and protection protocols, the translation of DFDR data file to engineering units, and the synthesis and analysis of DFDR data);

(5) the **Quick Access Recorder** (the "QAR") aboard the subject aircraft (which included, but was not limited to, the subjects of the QAR system design and operation, the QAR data recovery, the operational use of QAR data, and the synthesis and analysis of QAR data);

(6) the **Cockpit Voice Recorder** (the "CVR") installed on the subject aircraft (which included, but was not limited to, the subjects of the CVR system design and operation, CVR data recovery, and the CVR data protection regulations and procedures);

(7) the **Trent 800 Three-Spool High Bypass Gas Turbine Engine**, which was the type of engine mounted on the 777-200 (which included, but was not limited to, the subjects of the Trent 800 design and development history, the incident engine inspection, the engine health monitoring systems, the assessment of global Trent 800 failures, the Trent 800 performance, the turbine blade sulfidation mechanisms, the sulfidation mitigation of the turbine blades, sulfidation mitigation methods, the turbine blade metallurgy, the turbine blade cooling, the contamination of turbine blade cooling air, the turbine operational blade stresses, engine turbine failure analysis, the assessment of engine global operating environments, including high salt environments, the engine component life

11

evaluation, the engine thrust rating settings, the engine trimming, the incident engine maintenance records and procedures, compressor surge/stall physics and effects, nondestructive testing and inspection techniques, and engine maintenance and repair logistics);

(8) the **Physics of Fuel Jettison** (which included, but was not limited to, the subjects of fuel jettison historical use cases, fuel jettison altitude requirements, fuel droplet formation in complex flow fields, aircraft wake interactions with the fuel flow, fuel droplet evaporation in turbulent environments, and fuel jettison sensitivities to changing environmental conditions);

(9) the **Simulation of the Subject Fuel Jettison** (which included, but was not limited to, the subjects of the fuel jettison modeling historical research, fuel jettison modeling methods and theory, fuel jettison modeling tool evaluation and selection – CFD, FJSIM, fuel droplet advection and dispersion modeling, empirical validation methods, wide area fuel jettison deposition quantification, wide area fuel jettison mapping, and fuel jettison mapping for varying flight path parameters);

(10) **Forensic Weather Modeling** of the day of Delta 89 (which included, but was not limited to, the subjects of Weather Research and Forecasting (also known as "WRF") modeling; weather data sampling and assimilation, large scale empirical weather modeling, forensic weather/environment recreation, and large weather model verification methods);

(11) the use and qualification of **Jet-A Fuel** in general (which included, but was not limited to, the subjects of jet fuel toxicology, jet fuel composition including the additives and their effects on fuel properties, jet fuel chemical constituents, jet fuel environmental exposure effects, jet fuel human exposure effects, jet fuel contamination detection, measurement and remediation, soil contamination sampling and testing methods, hazmat clean-up requirements for jet fuel, hydrocarbon degradation of roofing materials including chemically compatible asphalt shingles, and jet fuel persistence in soil, water, and other

materials);

(12) the **piloting and pilot training for the 777-200** and for Delta 89 (which included, but was not limited to, the subjects of flight deck hierarchical control structures, the topic of Crew Resource Management (CRM), threat assessment procedures and guidance, regulations governing Captain's Authority, Delta 777 pilot training – Fuel Jettison, Delta 777 pilot training – One Engine Operation, Delta 777 pilot training – Overweight Landing, Delta 777 pilot training – Non-Normal Procedures, Delta 777 pilot training – Engine Limit, Surge, or Stall, Delta 777 pilot training – Non-Normal Procedures, Delta's Flight Operations Manual ("FOM"), Delta's Flight Crew Training Manual ("FCTM"), Delta's Operational Data Manual ("ODM"), Delta's Quick Reference Handbook ("QRH") for non-normal procedures, preflight briefing procedures and planning, preflight inspection processes, and post flight logbook entry and incident reporting procedures);

(13) **In-flight communications for Delta 89** (which included, but was not limited to, the subjects of the architecture of Air Traffic Control ("ATC")  and ground communication network, ATC radio frequency handoff procedures, crew ATC communication responsibilities, division of labor in communication within the flightdeck during emergency procedures, ATC communication recording parsing and syncing with DFDR data, Delta's requirements and procedures for contacting Dispatch (including during emergencies), Dispatch communication methods and protocols, post-incident Aviation Safety Action Program ("ASAP") report filing rules and guidelines, and Automatic Dependent Surveillance-Broadcast ("ADS-B") system operation and data synthesis);

(14) **in-flight navigation** (which included, but was not limited to, the subjects of analysis of the topography of Greater Los Angeles and surrounding areas, in-flight emergency route planning, airport landing aids (including Instrument Landing System  ("ILS") and VHF Omnidirectional Range ("VOR")),

13

LAX runway layout, runway lengths and runway weight limits, nearest alternate field research, and Traffic Alert and Collision Avoidance System ("TCAS") operation and limitations; and

(15) **Accident and incident analysis methods** (which included, but was not limited to, the subjects of Causal Analysis based on System Theory – "CAST", human factors considerations in pilot training and operations, incident recreation, and safety theory error learning.)

Class Plaintiffs' lead counsel, Filippo Marchino, has a specialized education and understanding of aviation. Prior to attending law school, Mr. Marchino obtained both a bachelor's and a master's degree in aerospace engineering. [Marchino Decl. ¶7.] In obtaining his master's degree, Mr. Marchino focused on aircraft flight dynamics and materials technology, including composite and metal bonding. Mr. Marchino's thesis was on the topic of Friction-Stir Welding in aviation. *Id.* Throughout his aerospace education at the world's largest aviation academic institution, Embry-Riddle Aeronautical University, Mr. Marchino spent significant time around aircraft, including working with maintenance personnel in both aircraft structures and aircraft powerplants. *Id.* Additionally, Mr. Marchino has been flying airplanes since the Fall of 1998, and, while not a professional pilot, he has accumulated time across a variety of aircraft, including simulator time in a 777 Level D simulator. *Id.* Simply put, Mr. Marchino's intimate knowledge of aviation, ranging from the design to the piloting of aircraft, was crucial to Class Plaintiffs' success. In fact, Mr. Marchino personally supervised all of the discovery, supervised and coordinated all of Class Plaintiffs' experts, directed all of the third party discovery (including third party subpoenas to Rolls-Royce (the manufacturer of the engine powering the aircraft) and Boeing (the manufacturer of the 777-200ER)), took all but three of the 32 fact witness depositions (including six of Delta's pilots[7], Delta's Director of Quality Assurance, Manager of

---

[7] The entire DL89 crew of four pilots, plus Fed. R. Civ. P. 30(b)(6) witnesses Bill Thurber, Fleet Captain at Delta, and Steve Wilson, former Chief Pilot at Delta.

---

**CLASS PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS UNDER RULE 23(H)**

Flight Ops Publications, General Manager of Properties and Facilities, General Manager of Propulsion Engineering, Flight and Safety Specialist, Manager of Flight Safety Management System, Director of State and Local Government Affairs, General Manager of Field Technical Operations, and Delta 89's Purser Flight Attendant), took the depositions of each of Defendant's eight experts, defended 11 of the 12 depositions of the Class Plaintiffs' experts, reviewed the majority of over 64,000 pages[8] of technical documents produced by Delta (including the various manuals used by Delta for the Boeing 777 – the Delta B777-200ER Operational Data Manual, Delta 777 Operations Manual, DAL Flight Operations Volume 1 777, DAL Flight Operations Volume 2 777, DAL FOM - Flight Ops Manual, and DAL Flight Crew Training Manual 777), and analyzed the Digital Flight Data Recorder ("DFDR") data from Delta 89. [Marchino Decl. ¶7.] All of these tasks required Class Plaintiffs' counsel to draw upon his aviation and engineering knowledge. [Marchino Decl. ¶8.] Likewise, the fact that Plaintiffs retained a total of 13 experts, seven of whom were scientific, aviation, and/or engineering experts,[9] further demonstrates the complexity of the case. Marchino Decl. ¶9.

Even settling this case was challenging, requiring four in-person mediation sessions with Hon. Louis M. Meisinger (Ret.). One mediation session involved the parties' presentation, to the other side, of a full-fledged trial opening/closing hybrid. The mediation sessions ultimately resulted in Judge Meisinger making a mediator's proposal that finally resolved the case, on the eve of trial, after five years of intense litigation. [Marchino Decl. ¶10.]

All of the above facts support an upward departure. <u>See Andrews</u>, 2022 WL

---

[8] This includes productions from Boeing and Rolls-Royce. Delta alone produced over 51,000 pages of documents. This number does **not** include documents produced by the parties' experts.

[9] The experts include Engineer Cobb, Engineer Sharp, Weather Systems Expert Dr. Austin, Captain and FAA expert Taylor, Captain Malmquist, Environmental Geologist Dr. Wells, and Engineer Dr. Dahm.

15

1  4453864, at *3 ("the extensive and technical fact and expert discovery, the multiple
2  motions for summary judgment, trial preparations, and three formal daylong mediations
3  underscores the skill and effort needed to achieve the" settlement).

4     "In addition to the difficulty of the legal and factual issues raised, the court should
5  also consider the quality of opposing counsel as a measure of the skill required to litigate
6  the case successfully." In re Am. Apparel, Inc. S'holder Litig.., No. CV 10–06352
7  MMM (JCGX), 2014 WL 10212865, at *22 (C.D. Cal. July 28, 2014); see also
8  Andrews, 2022 WL 4453864, at *3 ("And especially when considering that Defendants
9  were represented by a prominent litigation firm, Class Counsel's ability to get the case
10 this far along evinces their high quality of work."). Here, Class Counsel litigated against
11 two very prominent law firms with extensive class action defense and aviation litigation
12 experience: Clyde & Co LLP and King & Spalding LLP.[10]

13    The Clyde & Co team was led by four partners: New York-based Jeffrey Ellis (a
14 multi-decade veteran of the aviation bar, listed in the "Guide to the World's Leading
15 Aviation Lawyers," and who was a lead counsel in the 9/11 litigation);Washington
16 D.C.-based Orla M. Brady (who was previously a Trial Attorney in the U.S. Department
17 of Justice, Aviation, Space & Admiralty Section in Washington, D.C.); Washington
18 D.C.-based Kenneth P. Quinn (a litigation, regulatory, enforcement, antitrust, and
19 corporate counsel to several domestic and international airlines); and Los Angeles-
20 based Kevin Sutherland (who has 30 years of litigation practice involving aviation).
21 [Marchino Decl. ¶12.]

22    The King & Spalding team was led by some of the most brilliant lawyers in
23 Southern California, which included no less than five partners: Arwen R. Johnson
24 (managing partner of the Los Angeles office of King & Spalding, leading over 60
25 attorneys); Michael R. Leslie (an accomplished trial lawyer and negotiator who focuses
26 on complex environmental litigation); Kelly Perigoe (a motion practice sniper who

---

[10] And each of these well-regarded firms assigned highly experienced teams consisting
of lawyers considered experts in their fields.

focuses on appeals and critical motions in state and federal appellate courts); Lennette Lee (whose practice extends to all areas of complex commercial litigation, with a particular emphasis on consumer class actions); and last, but not least, David K. Willingham (a trial lawyer with a resume that spans decades and who, prior to entering private practice, was the Deputy Chief of the Major Frauds Section of the United States Attorney's Office in the Central District of California). [Marchino Decl. ¶13.]

In addition, Delta was able to count on the assistance of several very talented in-house counsel with extensive aviation related experience, including Gary Bunce (who has continuously been involved in aviation-related law since 2001 (first at Northwest Airlines and, since 2008, at Delta), and Armen Adzhemyan (who has been at Delta since 2021 and who previously served as an Assistant United States Attorney at the Department of Justice office in Atlanta, focusing on civil enforcement matters). [Marchino Decl. ¶14.]

In addition to these heavy-hitter partners, Class Plaintiffs faced a number of associates from King & Spalding and Clyde & Co, including some with backgrounds in Aerospace Engineering and litigation defending airlines. [Marchino Decl. ¶15.] In short, Class Plaintiffs' counsel faced over 17 attorneys on Delta's side, including 11 partners, or partner equivalents, and a number of very capable and competent associates.

Finally, Delta had the benefit of its inherent know-how and vast aviation-related resources. In fact, testimony throughout the case revealed that Delta's counsel went to incredible lengths to be ready for this case, including spending time in Delta's 777-200 Level D simulator recreating the subject Delta 89 Flight, and interacting with numerous specialists at the company, including engineers, maintenance team members, pilots and the like. Class Plaintiffs' Counsel, on the other hand, did not have any of those resources readily available, and, at every turn, had to come up to speed in each subject matter and field of expertise and/or fight for access to information and resources.

17

5. **Class Counsel Carried Considerable Financial Burden in Litigating This Complex and Time-Consuming Action.**

It is an established practice to reward attorneys who, as here, assume representation on a contingent basis to compensate them for the risk that they might be paid nothing at all. See In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1299-1300 (9th Cir. 1994). Such a practice encourages the legal profession to assume such a risk and promotes competent representation for plaintiffs who could not otherwise hire an attorney. Id.; see also Vizcaino, 290 F.3d at 1051.  Class Counsel devoted many thousands of hours and advanced in excess of $1,974,000 in costs to litigate this case over five years, taking the case to the verge of trial.  [Marchino Decl. ¶19.]  Logically, as a result of carrying costs of this magnitude for over half a decade, Class Counsel lost the ability to use the funds for other matters.  [Marchino Decl. ¶19.]  Additionally, undertaking a case of this complexity resulted in Class Counsel "turn[ing] down opportunities to work on other cases to devote the appropriate amount of time, resources, and energy necessary to handle this complex case." In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig., No. 2672 CRB (JSC), 2017 WL 1047834, at *3 (N.D. Cal. Mar. 17, 2017).  The burden was especially large here as Class Counsel's firm, *X-Law, is a small firm that has never had more than four attorneys at any one time*.  [Marchino Decl. ¶18; see also Declarations of Carlos Colorado ("Colorado Decl.") at ¶ 5; Thomas Gray ("Gray Decl.") at ¶ 5; and Richard Davis ("Davis Decl.") at ¶ 4.]  Often, every single X-Law attorney was devoting most if not all of their professional time working on this case. Id. Ultimately, the firm dedicated a significant percentage of its available "man-hours" to this one case. [Marchino Decl. ¶18.] Likewise, it made a significant expenditure of financial resources over the last five years by advancing $1,974,409.57 in litigation costs required of this case.  [Marchino Decl. ¶19.] In short, Class Counsel took significant and potentially existential risks in taking on this case, and there was a significant opportunity cost in doing so.

6. **The Fees Requested Are Comparable to Those Awarded In Other Class Actions.**

As was stated above, <u>Andrews</u> appears to be the only successful California environmental trespass class action that is comparable to the essence of this action. There, the fee award was 32% of the total settlement. <u>Andrews</u>, 2022 WL 4453864, at *1. The court there considered such an award comparable to awards authorized in similar [non trespass] cases." <u>Id.</u> at *4. As was noted above, "fee awards in class actions average around one-third of the recovery." <u>Knight</u>, 2009 WL 248367, at *6.

The $24 million fee request here, which was the amount Judge Meisinger recommended in his mediator's proposal, represents less than "one-third" of the recovery and less than the 32% that was awarded in <u>Andrews</u>.

7. **A Lodestar Cross-Check Confirms the Requested Fees Are Reasonable.**

The Ninth Circuit "has consistently refused to adopt a crosscheck requirement." <u>Farrell v. Bank of Am. Corp., N.A.</u>, 827 F. App'x 628, 630 (9th Cir. 2020). "Because the benefit to the class is easily quantified in common-fund settlements," the Ninth Circuit permits district courts "to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." <u>In re Bluetooth</u>, 654 F.3d at 942. "[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award." <u>Vizcaino</u>, 290 F.3d at 1050.

In performing a cross-check, the Court need not "closely scrutinize each claimed attorney-hour, but [may] instead use [ ] information on attorney time spent to focus on the general question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys." <u>Spann v. J.C. Penney Corp.</u>, 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016); <u>see also</u> <u>Rieckborn v. Velti PLC</u>, No. 13-3889, 2015 WL 468329, at *21 (N.D. Cal. Feb. 3, 2015) (similar). The goal is to "do rough justice, not to achieve auditing perfection." <u>Hefler v. Wells Fargo & Co.</u>, No. 16-CV-05479-JST,

19

2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018).  see also In re Capacitors Antitrust Litig., 2018 WL 4790575, at *6 (N.D. Cal. Sept. 21, 2018) (cross-check does not require "mathematical precision [or] bean-counting").

i. **Class Counsel Expended a Reasonable Number of Hours Litigating This Case.**

As was summarized above and in the motion for preliminary approval, this was a highly technical and legally complex case that required extensive investigation and analysis over the past five years. During this time, Class Counsel dedicated approximately 12,783 hours to litigating this case. [Marchino Decl. ¶20.]

There was a total of 1,472 discovery requests served by Plaintiffs and Delta, a total of 68,184 unique pages of documents produced by Delta in discovery (of which approximately 64,000 were technical in nature), a total of 349,570 unique pages of expert materials exchanged between the parties during the course of expert discovery, 32 fact witness depositions and 20 expert depositions. [Marchino Decl. ¶22.] In total Plaintiffs' counsel spent approximately 8,203 hours on discovery and expert-related matters. Id.

Class Counsel also spent a significant amount of time engaging in thorough legal research and briefing efforts to respond to each of Delta's motions. As the Court will recall, Delta filed, among other motions, a standard of care motion, a standard of care motion for summary judgment, and numerous Daubert motions. [Marchino Decl. ¶23, Colorado Decl. ¶5, Gray Decl. ¶5.] It also filed hundreds of pages of evidentiary objections. Id.

In addition, class certification was highly time-consuming, with Class Counsel spending a total of approximately 826 hours on it and related matters. [Marchino Decl. ¶24.]

Lastly, Class Counsel estimate it will take approximately 374 hours of work to see this case through until final approval is granted. [Marchino Decl. ¶25.]

### ii.  Class Counsel's Rates Are Reasonable

Class Counsel have submitted their current hourly rates.  [Marchino Decl. ¶26, Colorado Decl. ¶10, Davis Decl. ¶7, Gray Decl. ¶10.] Each attorney has extensive litigation experience. [Marchino Decl. ¶¶7-9, Colorado Decl. ¶4, Davis Decl. ¶3, Gray Decl. ¶4.]

"'[A]ttorneys in common fund cases must be compensated for any delay in payment' and failure to do so is an abuse of discretion." Stanger v. China Elec. Motor, Inc., 812 F.3d 734, 740 (9th Cir. 2016) (quoting Fischel v. Equitable Life Assur. Soc'y of U.S., 307 F.3d 997, 1010 (9th Cir. 2002)).  To do this, the Court may "apply the attorneys' current rates to all hours billed during the course of the litigation." Id. (citations and quotations omitted).

In reviewing the reasonableness of hourly rates, courts may use their own familiarity with the local legal market.  Ingram v. Oroudjian, 647 F.3d 925, 928 (9th Cir. 2011).  In addition, indeed, "[a]ffidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990).

Courts in this Circuit routinely approve similar or higher hourly rates to those here in complex class action cases like this. See, e.g., Ramirez v. Trans Union, LLC, No. 12-CV-00632-JSC, 2022 WL 17722395, at *9 (N.D. Cal. Dec. 15, 2022) (approving hourly rates ranging "from $1,325 to $560 for partners and associates, and $485-$455 for 'litigation support' and paralegals"); In re Wells Fargo & Co. S'holder Derivative Litig., 445 F. Supp. 3d 508, 527 (N.D. Cal. 2020) (approving hourly rates up to $1,075 for partners and $660 for associates); Waldrup v. Countrywide Fin. Corp., No. 2:13-CV-08833-CAS-AGRx, 2020 WL 13356468, at *2 (C.D. Cal. July 16, 2020) (rates of up to $975 for partners and $625 for associates).  In addition, Professor Silver has determined that Class Counsel's rates are reasonable and typical of those charged

1    by other attorneys.  [Silver Report at 20-25.]

2                                iii.   **Class Counsel's Performance and the Results Achieved**

3                                       **Justify a Reasonable Lodestar Multiplier**

4         The Ninth Circuit *requires* an upward multiplier when certain risk factors are

5    present and authorizes a multiplier for certain "reasonableness" factors, including the

6    quality of representation, the complexity of the issues presented, and most importantly,

7    the benefit obtained for the class.[11]  See, e.g., Stetson v. Grissom, 821 F.3d 1157, 1166

8    (9th Cir. 2016); Kerr, 526 F.2d at 70; In re Bluetooth, 654 F.3d at 942. In this Circuit,

9    multipliers in the 1 to 4 range are "presumptively acceptable." Dyer v. Wells Fargo

10   Bank, N.A., 303 F.R.D. 326, 334 (N.D. Cal. 2014); see also Ochinero v. Ladera

11   Lending, Inc., No. SACV 19-1136 JVS (ADSx), 2021 WL 4460334, at *8 (C.D. Cal.

12   July 19, 2021) ("lodestar multipliers of 1.5 to 3.0 are most common").  "Multipliers in

13   the 3–4 range are common in lodestar awards for lengthy and complex class action

14   litigation." Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 298 (N.D. Cal. 1995).

15        Multipliers for large settlements, like this one, tend to fall on the high end of the

16   1 to 4 range. A 2017 study of attorneys' fees awarded in 458 class actions over a five-

17   year period (2009-2013) by Theodore Eisenberg and Geoffrey Miller found that the

18   average multiplier in cases with settlements valued over $67.5 million was 2.72 (above

19   the multiplier here). See Theodore Eisenberg, Geoffrey Miller & Roy Germano,

20   Attorneys' Fees in Class Actions 2009-2013, 92 N.Y.U. L. Rev. 937, 967 (2017).

21        As this data shows, courts routinely approve lodestar multipliers at or above those

22   _____

23   [11] The "reasonableness" factors are (1) the time and labor required, (2) the novelty and
     difficulty of the questions involved, (3) the skill requisite to perform the legal service
24   properly, (4) the preclusion of other employment by the attorney due to acceptance of
     the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time
25   limitations imposed by the client or the circumstances, (8) the amount involved and the
     results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the
26   "undesirability" of the case, (11) the nature and length of the professional relationship
     with the client, and (12) awards in similar cases. Kerr v. Screen Extras Guild, Inc., 526
27
28   F.2d 67, 70 (9th Cir. 1975).

                                      22

sought here; this includes settlements with a percentage of the fund above the benchmark 25% as well. See Vizcaino, 290 F.3d at 1051 n.6 (approving 3.65 multiplier, and citing appendix of cases showing "a range of 0.6-19.6, with most . . . from 1.0-4.0 and a bare majority . . . in the 1.5-3.0 range"); Steiner v. Am. Broad. Co., 248 F. App'x 780, 783 (9th Cir. 2007) (6.85 multiplier); Martin v. Toyota Motor Credit Corp., No. 220CV10518JVSMRW, 2022 WL 17038908, at *14 (C.D. Cal. Nov. 15, 2022) (6.33 multiplier); Retta v. Millennium Prods., Inc., No. CV15-1801 PSG AJWX, 2017 WL 5479637, at *12 (C.D. Cal. Aug. 22, 2017) (3.5 multiplier); Spann v. J.C. Penney Corp., 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016) (3.07 multiplier); Dickey v. Advanced Micro Devices, Inc., No. 15-CV-04922-HSG, 2020 WL 870928, at *8 (N.D. Cal. Feb. 21, 2020) (3.08 multiplier); Lloyd v. Navy Fed. Credit Union, No. 17-CV-1280-BAS-RBB, 2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019) (10.96 multiplier).

Here, the multiplier of approximately 2.29 is reasonable considering the contingent nature of Class counsel's work, the difficulty and risks of the case, and the enormous effort undertaken and risk faced over the past five years. [See Silver Report at 26-28.]

### B. Class Counsel's Expenses Are Reasonable and Appropriate.

Class Counsel may "recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters." Brown v. CVS Pharmacy, Inc., No. 15-cv-7631, 2017 WL 3494297, at *9 (C.D. Cal. Apr. 24,. 2017); see Fed. R. Civ. P. 23(h);  Staton, 327 F.3d at 974; Miller v. Ghirardelli Chocolate Co., No. 12-CV-04936-LB, 2015 WL 758094, at *7 (N.D. Cal. Feb. 20, 2015) (attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters) (citing Harris v. Marhoefer, 24 F.3d 16, 20 (9th Cir. 1994)). This includes expenses that are reasonable, necessary, and directly related to the litigation. See Willner v. Manpower Inc., No. 11-cv-2846, 2015 WL 3863625, at *7 (N.D. Cal. June

22, 2015).  Here, Class Counsel request reasonable expenses of $1,974,409.57.[12]

These expenses represent approximately 2.4% of the cash component of the settlement, are marginally below the threshold of $2,000,000 contemplated by Judge Meisinger's mediator's proposal, and are actually below the average in class action settlements.  Theodore Eisenberg & Geoffrey P. Miller, <u>Attorney Fees and Expenses in Class Action Settlements: 1993–2008</u>, 7 J. Empirical Legal Stud. 248, 274 (2010) (mean 2.8% 1993-2002 and 2.7% for 2003-2008); Theodore Eisenberg, Geoffrey Miller & Roy Germano, <u>Attorneys' Fees in Class Actions 2009-2013</u>, 92 N.Y.U. L. Rev. 937, 963 (2017) (mean of 3.9% for 2009-213).

These costs reflect the technical and complex nature of the case.  The vast majority, approximately $1,682,861.05 is related to experts and $103,677.13 to depositions and transcripts.  [Marchino Decl. ¶¶28-30.]  As courts have recognized, "Class Counsel had a strong incentive to keep expenses at a reasonable level due to the high risk of no recovery when the fee is contingent." <u>Gutierrez v. Amplify Energy Corp.</u>, No. 821 CV 01628 DOC JDEX 2023 WL 3071198, at *7 (C.D. Cal. Apr. 24, 2023). Those incentives apply equally here. Class Counsel expended only that which they believed was necessary to advance the interests of the Class. Class Counsel did not charge for in-house printing and photocopying, postage, mileage and the like. The requested costs are reasonable and, as noted above, supported by the results, and, therefore, should be reimbursed.

### C. The Class Representatives Have Earned the Requested Service Awards Through Years of Dedication to This Case.

"Incentive awards are fairly typical in class action cases." <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 958 (9th Cir. 2009). When assessing requests for incentive awards, courts consider five principal factors:

(1) the risk to the class representative in commencing suit, both financial

---

[12] This number does not include the notice and claims administration costs that will be paid out of the Settlement Fund.

1   and otherwise; (2) the notoriety and personal difficulties encountered by
2   the class representative; (3) the amount of time and effort spent by the class
    representative; (4) the duration of the litigation; (5) the personal benefit (or
3   lack thereof) enjoyed by the class representative as a result of the litigation.

4   Van Vranken, 901 F. Supp. at 299.

5          In addition to any settlement distributions they receive, the Court-appointed Class

6   Representatives request the full amount of the service awards contemplated by Judge

7   Meisinger's mediator's proposal in the amount of $15,000 each, for a total of $60,000,

8   to compensate them for the time and effort they spent pursuing this matter on behalf of

9   the Class.  Each of these Class Representatives searched for and provided extensive

10  facts used to compile the Second Amended Complaint, helped Class Counsel analyze

11  claims, sat for deposition, followed the case throughout its years long trajectory, and

12  reviewed and approved the proposed Settlement. They each have submitted declarations

13  further explaining the time and effort they expended to benefit the class. [Lomas Decl.;

14  Yancor Decl.; Jose Alvarado Decl.; Maria Alvarado Decl., Colorado Decl. at 11.]

15         Service awards of this size or even larger "are fairly typical in class action cases,"

16  and should be approved here. See, e.g., Rodriguez, 563 F.3d at 958; see also Wells

17  Fargo, 445 F. Supp. 3d at 534 (granting $25,000 service awards to each institutional

18  investor plaintiff); In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap

19  Antitrust Litig., No. 4:14-MD-2541-CW, 2017 WL 6040065, at *11 (N.D. Cal. Dec. 6,

20  2017) (awarding each of the four class representatives $20,000 service awards); Garner

21  v. State Farm Mut. Auto. Ins. Co., No. CV 08 1365 CW EMC, 2010 WL 1687832, at

22  *17 (N.D. Cal. Apr. 22, 2010) (collecting Ninth Circuit cases with service awards of

23  $20,000 or higher).   Moreover, a $15,000 service award to each of the four Class

24  Representatives amounts to a total payment of $60,000, or less than 0.08% of the gross

25  Settlement amount. This is well within the range the Ninth Circuit has found reasonable.

26  Staton, 327 F.3d at 976-77.

27

28

**CLASS PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF
ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS UNDER RULE 23(H)**

1

**IV.   CONCLUSION**

2         Class Plaintiffs and Class Counsel respectfully request that the Court

3   preliminarily approve an award of $24 million in attorneys' fees and $1,974,409.57 in

4   reasonable expenses to Class Counsel, and award *each* of the four Class Plaintiffs

5   $15,000 as service awards.

6

7   DATED: August 25, 2025              THE X-LAW GROUP, P.C.

8

9

10                                      By:_____

11                                      FILIPPO MARCHINO, ESQ.,
                                        Class Liaison Counsel and Attorneys
12                                      for Class Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLASS PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS UNDER RULE 23(H)**